# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Silver Apple iPad seized from 12650 Lakeshore Drive Unit 136, Lakeside CA 92040

)
)
)
)
)
)

Case No. **25-mj-00772**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-5, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-5, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18, USC secs. 1591, 2422(b), 2251(a) | Sex Trafficking of a Minor, Coercion and Enticement of a Minor, and Sexual Exploitation of a Minor |

The application is based on these facts:

See Attached Affidavit of Special Deputy US Marshal Katherine Adams, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Katherine Adams*

*Applicant's signature*

Special Deputy US Marshal Katherine Adams

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date: _____ 02/14/2025 _____

*Judge's signature*

City and state: San Diego, California

Hon. Michael S. Berg, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT

I, Katherine Adams, having been duly sworn do hereby state that the following is true to my knowledge and belief.

1.    I make this affidavit in support of an application for a search warrant of the following devices (collectively referred to herein as the "**Target Devices**"):

    a) Silver Dell laptop with stickers (**Target Device #1**)
    b) Silver Sabrent (**Target Device #2**)
    c) Black Google cellphone with scratches on back (**Target Device #3**)
    d) Silver Dell laptop with power cord (**Target Device #4**)
    e) Silver Apple iPad (**Target Device #5**)

collectively, the **Target Devices**, which are believed to be evidence of violations of 18 U.S.C. §§ 1591, 2422(b) and 2251(a). The **Target Devices** are presently located within the Southern District of California.

2.    On August 28, 2024, the Honorable David D. Leshner, United States Magistrate Judge for the Southern District of California, issued Federal search warrant 24MJ3301 for WALTON's residence, 12650 Lakeshore Drive Unit 136, Lakeside, CA 92040. The search warrant was executed that day. WALTON was taken into custody on August 28, 2024, prior to the execution of the search warrant.

3.    The prior warrant, 24MJ3301, authorized the offsite imaging and preliminary analysis of computers, other electronic storage devices, and media to confirm their status as instrumentalities to be conducted within forty-five (45) days of seizure. The warrant also required personnel conducting the identification and extraction of cellular device data to complete the analysis within ninety (90) days, absent further application to this court. As explained below, the FBI was unable to conduct the search within the parameters of the original warrant, and therefore, is seeking a new warrant to complete the search. Agents are seeking authority to complete the search of the **Target Devices**.

4.    **Target Device# 1**, **Target Device #4,** and **Target Device# 5** were taken to the San Diego Regional Computer Forensics Lab (RCFL) for processing on September 9,

2024, but no data has been reviewed. Investigators were unable to process and extract data from **Target Device #2 and Target Device #3** during the allotted timeframe.

5. The purpose of this warrant is to permit the extraction of data from **Target Device # 2** and **Target Device #3** and allow for the seizure of materials from the **Target Devices** and all other related materials and evidence tending to demonstrate a violation of 18 U.S.C. §§ 1591, 2422(b) and 2251(a) in the **Target Devices**, as detailed in Attachments B-1 to B-5.

## TRAINING AND EXPERIENCE

6. I am a peace officer employed by the San Diego District Attorney's Office and have been so employed for approximately two years. I am currently assigned to the San Diego Human Trafficking Task Force (SDHTTF). My responsibilities are to investigate the commercial sexual exploitation of individuals who engage in these acts under force, fear, or coercion. I have arrested or been involved in over 100 human trafficking, pimping, or prostitution related arrests. I have completed over 100 hours of Human Trafficking Investigation training and completed my master's thesis on Human Trafficking in San Diego. I was previously assigned to the Workplace Justice and Insurance Fraud Division, where I investigated labor trafficking, wage theft, and other workplace crimes.

7. I was previously employed by the San Diego Police Department for approximately ten years. I was a San Diego Police Street Gang Detective assigned to the Gang Unit. Part of my duties were, but not limited to, monitor, arrest and document street gang members throughout the City of San Diego. I also responded to and investigated felony crimes that various street gangs and street gang members are involved in, including but not limited to gang related robberies, assaults, attempted murders, and murders. My responsibility was to monitor the street gangs known as "5/9 Brim" and "Emerald Hills Blood Gang."

8. Prior to my Street Gang Unit assignment, I was a Detective at the San Diego Police Department's Child Abuse Unit and Vice Unit. My responsibilities in Child Abuse were to investigate certain homicides of children under the age of 18, child molest cases,

and child physical abuse cases. My responsibilities in the Vice Operations Unit included but were not limited to investigating pimping, pandering, prostitution, and human trafficking cases. In addition, I also investigated alcohol & tobacco violations, illegal gambling cases, and counterfeit sales of merchandise.

9.    I was previously assigned as a uniformed officer to the San Diego Police Department's Gang Suppression Team for approximately two years. My responsibilities included but were not limited to monitoring gang activity, developing intelligence, documenting gang members, investigating gang related crimes, and working with Street Gang Detectives regarding gang activity. Prior to being with the Gang Suppression Team, I was assigned to Mid-City Division as a patrol officer for approximately three years. During my time at Mid-City, I assigned to the Bicycle Team for approximately one year. The unit was tasked with proactively targeting and investigating violent crimes throughout East and Southeastern San Diego.

10.    The facts in this affidavit come from my personal observations, my training and experience, and information from other law enforcement officers and witnesses. Since this affidavit is for the limited purpose of obtaining the requested warrant, it does not set forth every fact that I or other law enforcement personnel may have learned in connection with this ongoing investigation.

11.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1591, 2422(b), and 2251(a) have been committed by Brendon WALTON.

12.    As a result of my training and experience, and the training and experience of other law enforcement officers working investigations involving child exploitation and child pornography, with whom I have had discussions, there are certain characteristics common to individuals involved in the receipt, distribution and possession of child pornography.

        a. These individuals may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasizing while viewing children engaged

in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity.

b. These individuals may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, video tapes, books, sliders and/or drawings or other visual media. These individuals often use these materials for their own sexual arousal and gratification. Furthermore, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c. To the extent these individuals possess and maintain "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., they almost always maintain those hard copies in the privacy and security of their home. They typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and video tapes for many years. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

d. Likewise, these individuals often maintain their digital or electronic collections of child sexual exploitation images in a safe, secure, and private environment, such as a computer and surrounding area, or on cellular telephones. These collections are often maintained for several years and are kept close by, usually at the individual's residence, on his or her person, or in his or her vehicles, to enable the individual to view the collection, which is valued highly.

e. These individuals also may correspond with and/or meet others to share information and materials; are rarely able to completely destroy correspondence from other child pornography distributors/collectors; conceal correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of

individuals with whom they have been in contact and who share the same interests in child pornography.

f. These individuals prefer not to be without their child sexual exploitation images for any prolonged time period. Collectors will take their collection with them if they change residences, as the collection is considered to be a prized possession. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world. That said, there are individuals with a sexual interest in children who download and view digital images of child sexual exploitation and delete it in order to avoid detection by law enforcement or other people. However, even in cases where these images are deleted, or concealed via encryption software, forensic examiners can use specialized tools to recover the deleted files or access encrypted files.

g. These individuals often use specialized software to conceal the existence of evidence and/or destroy said evidence. There are a variety of different programs that an individual can use to accomplish these objectives, many of which are free. Additionally, these individuals have been known to store child pornography in unconventional physical locations, as well as in unusual digital locations on computers and cellular phones. These files and folders, or applications, have been misnamed or renamed in an attempt to mislead investigators.

h. These individuals will often download and store images of children they know or with whom they have communicated, as well as their communications with those children. The images may not necessarily be pornographic or obscene in nature; however, they are often used for the individuals' sexual gratification.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

13.    On March 10, 2024, at approximately 0415 hours, during a San Diego Human Trafficking Task Force (SDHTTF) proactive operation, detectives noticed two females with youthful appearances walking near Woden Street and Dalbergia Street. Based on my training and experience, this area is known as the "blade", a geographical location for street prostitution. One of the females, JF1, was picked up by a potential customer and stopped

by investigators. JF1 was 13 years old at the time. The other female, JF2, was 15 years old, and was later detained hiding in bushes. JF1 stated she had worked as prostitute prior to this and was here tonight to make money. JF2 stated she was there to be with JF1 but did not plan on having any prostitution dates. Task Force Officer (TFO) Wiener was conducting a consent search of JF1's phone and found a video of her and JF2 performing oral copulation on a male. JF1 said she does not know the male and it was one of JF2's friends. She stated it was a month ago and was under the influence when the video was taken. She would not recognize the male if she saw him again. She has the video because JF2 sent it to her, and they had intention of selling the video on Snapchat for money. During her interview, JF2 told TFOs that she did not intend to prostitute herself, she did not know much about the prostitution lifestyle, and she did not post photos on any commercial sex advertisement websites.

14.     On April 4, 2024, I received an email from a Protective Service Worker with Child and Family Well-Being (Formerly Child Welfare Services), which stated she received information from an Assistant Principal of a San Diego High School. The Assistant Principal had been made aware of a "menu" offered by JF2 and sent a screenshot, which offered different sex acts for different amounts of money.

15.     On April 24, 2024, I spoke to JF2's grandmother who told me her and her husband help JF2's father raise JF2. She was generally a good child growing up and they did not have any major issues until about a year ago when JF2's behavior abruptly changed. After the incident on March 10, 2024, JF2's grandmother took JF2's phone away. JF2's grandmother said she saw "gross" photographs of JF2 in the nude and engaging in sexual activity. JF2 has been sneaking out of the house and leaving school early.

16.     On June 11, 2024, I was notified by SDHTTF Detective Sergeant Mitch Jones that he received an email regarding JF2. JF2's grandmother reported JF2 as a runaway to SDPD (Case #24400947). The runaway case was assigned to SDPD Detective Kayla Ruud.

17.     On June 11, 2024, Detective Ruud met with JF2's grandmother and JF2's grandmother provided her with the cell phone she confiscated. JF2's grandmother showed

Detective Ruud content in the cell phone, and she observed several videos of JF1 and JF2 having sexual intercourse with an adult male with tattoo on his lower abdomen with the words, "Death be my love" (videos described below). Detective Ruud provided me with the three cell phones.

18.    On June 26, 2024, I reviewed notes taken by a Protective Service Worker regarding contact with JF2. In the notes, denied working as a commercial sex worker and denied having a trafficker. JF2 also reported she has had deals online where she met up with people, but denied any sexual contact with anyone she meets up with from online. She did report to having people online sending her money. She refused to disclose who was sending her money.

19.    On July 1, 2024, Honorable Judge Paula Rosenstein signed a search warrant for JF2's three cell phones, Instagram account, and Snapchat account. On July 2, 2024, I submitted the search warrant to Meta, Inc (Instagram parent company) and Snapchat for their records.

20.    On July 3, 2024, I began downloading the first phone (iPhone) which belonged to JF2.   On July 8, 2024, with the assistance of San Diego Sheriff's Office (SDSO) Analyst Ray Solano, we downloaded JF2's second phone (Samsung). We were unable to download the third phone (Nokia). I also received the social media return from Meta, Inc for JF2's Instagram account.

21.    I first started to review the Instagram return. I started with the media (photographs and videos) and found numerous photos of JF2. This would be expected on her phone, however, many of these photos depicted her in minimal or no clothing or various stages of undress. She was often wearing lingerie, full makeup, and had her hair done, posing in ways that were consistent with either photographs taken for online commercial sex advertisements, or those sold to buyers looking to purchase illicit content from females online. There were several photographs of JF2 appearing to be in clubs or at parties. I found three videos of the oral copulation described by Detective Ruud in her initial investigation. I later determined the individual was Brendon WALTON (See below).

22.     After obtaining a digital extraction of the iPhone belonging to JF2, I next conducted a search of the phone extraction report. There were several conversations where JF2 and the individuals talked about her selling of sexual content online and her menu. Additionally, there were several messages in her phone indicating JF2 wanted to be an influencer. I found thumbnails of the videos described by JF2's grandmother and Detective Ruud regarding the sexual intercourse and oral copulation between JF1, JF2, and an unknown male. I was unable to view the videos but was able to see JF1 and JF2's face in the thumbnail photograph. I conducted several searches in the phone download and was unable to find the actual video file, despite the thumbnails being visible. I believed the videos were in the "Hidden" file on JF2's phone and were not downloaded to my copy of the phone. JF2's grandmother also previously stated she viewed the videos in the Hidden file on the phone. I conferred with SDSO Analyst Solano, and he was also unable to find the original video files on the download. He also stated if the files were in the Hidden file, it is possible they were not downloaded.

23.     There were several videos that indicated they were attachments. The phone extraction report indicated that the videos were shared in a text message conversation with a male saved as ""Brendon(sd😜)" with the number (619) 715-4502 (the x4502 number)." I conducted a search of the phone extraction report for the number and the name "Brendon Walton" appeared as an unknown caller in the call log.

24.     I also found a conversation between WALTON and JF2 and six money transfers between them (described below).

25.     The conversation I found began on December 20, 2023, at 2044 hours (UTC time) and it was with an individual saved as "Brendon(sd😜)" with the x4502 number. I conducted a records search on the x4502 number and found an individual named Brendon WALTON listed as a victim in a crime case in Escondido (Crime Case #23004361). WALTON also provided his California Driver's License (CDL) number. I looked at his CDL photograph, and it was a 35-year-old white male, who was 5'11 tall, and weighed 165.

26.     All the messages were in UTC time, which is approximately seven to eight hours ahead of Pacific time (depending on daylight savings time).

27.     The first messages were from WALTON and said, "Hey Asia," and "This is Brendon from bumble." They sent several messages asking about their day and several of these messages were audio messages. The phone's transcription of one audio message from WALTON said, "Well, I see that you're looking for a sugar daddy so basically I wanna play with you I wanna make you happy." Based on my training and experience, a "sugar daddy" is a term for an older male who financially provides for a younger woman in return for companionship or sexual favors. WALTON went on to say, "Which means tomorrow I get to know you a little bit. Get to know what you like what you want and You get to know what I like and what I want and then we can go from there." JF2 agreed. He then asked her if she can drive and she said she was too short to drive at 4'9. WALTON responded, "I like this…" JF2 asked how tall he was and responded, "5'11"". WALTON went on to say he lives in Ocean Beach, near Sunset Cliffs.

28.     On December 21, 2023, at 1702 hours (UTC time), WALTON sent an audio message which essentially said he had a salary in the six figures, but he does "not look like it." He stated he does not drive a nice car and asked her not to judge him. He went on to ask her if she has done this before and she said she has not. He asked her what it meant to her, and she replied, "Hmmm don't sugar daddy's spoil & give money to sugar baby's." He asked if it would be reciprocated and stated he is looking for a girlfriend but wanted to "have fun and play" and asked her to let him know what she would be comfortable with. She asked to get to know him before they became intimate. They made plans to meet up and he asked her to wear "something sexy" that will "show off your ass." They made plans, and per their messages, met up at Fashion Valley mall. At 2344 hours (UTC time), she stated she was near the food court.

29.     Approximately three hours later, on December 22, 2023, at 0228 hours (UTC time), WALTON wrote, "Asia…" and "I'm still high from that tiny little pussy of yours … and I forgot to give you that nic." They sent a few more messages then JF2 said she was

going to go to sleep. Based on my training and experience, the term "nic" refers to a non-reusable pre-filled container of vape juice that snaps or slides into a device. This usually comes with a "Puff bar," which is a disposable vaping product that comes in a variety of flavors.

30.     On December 22, 2023, at 1754 hours (UTC time), JF2 sent WALTON a message which stated, "Heyy good morninggg do u mind sending me 40$ for concert tickets today?" She also asked for money for Ubers to the concert. He agreed, they talked further about the concert, and he stated he bought the tickets and sent her the money via Apple Pay.

31.     On December 22, 2023, at 2049 hours (UTC time), WALTON sent JF2 a message which said, "I just reupped on blow and ran some errands. I'll be doing some laundry in a bit and going to get some drinks later" He went on to say, "Oh hey… if you run into anyone who wants blow or molly, let me know. The quality of both is super good and for each sale that comes from you, I'll send you part of the profit I make." JF2 said okay. They went on to talk about the concert and she sent him photographs from the night before. Based on my training and experience, the term "blow" refers to cocaine, which is a controlled substance. Based on my training and experience, "molly" is a street name for MDMA or ecstasy, which is a controlled substance.

32.     On December 31, 2023, WALTON and JF2 sent several messages to each other talking about New Year's Eve parties. JF2 invited WALTON to go with her to the party and she said she is deciding between two parties of which one she wants to go to. On January 1, 2024, at 0136 hours (UTC time), WALTON asked, "Do you have a fake ID?" She said she does not but wants one. WALTON asked, "Are those events 21 and up?" She said one was but the other was 18 years old and up for admittance. WALTON states they should go to the 18 years and older event. She sent him some photographs of different outfits to wear, and he picked one. At 0344 hours (UTC time), JF2 asked, "You gonna bring coke?" WALTON responded, "Yes" and also stated he was going to bring "weed."

10

Based on my training and experience, the term "coke" refers to cocaine, a controlled substance and "weed" refers to marijuana.

33.    He continued to ask when they could leave for the party, and she told him repeatedly she was waiting for her family to go to sleep because she would need to sneak out. At 1124 hours (UTC time), he said he was there. Approximately 11 hours later, at 2228 hours (UTC time), he asked her if she got in trouble, and she said no. She repeatedly told him she needs to wait until her family goes to bed before she can sneak out.

34.    On January 2, 2024, at 1903 hours (UTC time), WALTON sent JF2 a message which said, "Are you back at school yet?" She said she was, and WALTON said he hated school. He told her wanted to hang out with her that day and she said, "I have school rn thoooo" (*right now*). He said after and asked her to ditch school. She said she can't leave school and can't hang out with him because her "family has been strict" on her.

35.    On January 5, 2024, at 1714 hours (UTC time), JF2 sent WALTON a messages asking for $50-100 to buy a phone. He stated he would do it that day or the next. Per the messages, he sent the money to her via ApplePay.

36.    On January 6, 2024, 2313 hours (UTC time), WALTON asked JF2 what she was doing that day. She stated she was going to a party and was a promoter. He asked if she could hang out with him before the party and she said, "I cantttt my family not letting me outtt." He asked how she was going to the party, and she said she was going to sneak out. He asked why her family was being strict and JF2 said her grades were bad. They continue to talk about going to the party that night and after several messages he asked, "Are you gonna wanna do coke tonight?" She replied, "Yess." He drove to her location and picked her up.

37.    On January 7, 2024, at 1415 hours (UTC time), WALTON gave JF2 advice on how to not get caught sneaking out. He told her, "Then don't try and be quiet. Make sure the noise of you opening and closing the bathroom and bedroom doors are clearly you going to the bathroom" and "Even cough so they know it's you..."

38.    On January 12, 2024, at 1639 hours (UTC time), WALTON initiated a conversation and then said, "You got school today, right?" He then asked her plans for the weekend and if her family was still being strict on her. She said they were still being strict.

39.    On February 23, 2024, at 1645 hours (UTC time), WALTON asked JF2 if there was a day she could spend with him, and he asked if she had school that day. She said she did have school. He went on to ask if she would be sneaking out again when they hang out.

40.    On February 24, 2024, at 0520 hours (UTC time), JF2 asked for money for an Uber to go see her best friend. Per the messages, he sent her the money. He then asked who her friend was, and she responded with a video of her and JF1. In the video, JF2 is wearing a red bra and JF1 is smoking something. They both have youthful appearances.

41.    JF2 then asked WALTON, "Do u do doubles she was asking." WALTON responded, "Threesome?" "or wdym by doubles?" (*What do you mean*). JF2 responded, "Yes like threesome." WALTON responded, "Yes" and "I would love wo with the two of you." He then asked, "What is her name and how old is she?" Four minutes later, WALTON sent an audio message which said, "Well good morning what a great question Yes, I would love to two of you. She is also fucking hot. And what are your ladies plans for today and tomorrow?" JF2 responded to WALTONS question about JF1's age and name and said, "Her name is Rican and she 18."

42.    On February 25, 2024, at 0630 hours (UTC time), JF2 sent a message to WALTON and asked for Uber money to go see JF1. He said he would do it and wanted to know if he was seeing her the following day. She said they were going to try. He then sent her money, which she was not able to accept. She asked if he would send it on Cash App and told him her account was "$m1ndyobidness." He told her he sent her extra because of the good news that they were going to see them the next day. The next day WALTON sent a message, which went unanswered.

43.    On February 27, 2024, at 0807 hours (UTC time), WALTON sent a message which said, "Are you able to see me tonight? I have a female friend who wants to have

fun." He then sent two videos of an unknown naked female with a youthful appearance. The female was fully nude in both videos. He then said, "She wants to scissor you and have a threesome."

44.    On February 28, 2024, at 0808 hours (UTC time), JF2 sent a message to WALTON which said, "Hey can you get some stuff for me before me & my hg come" (*home girl*). He asked what she wanted and she responded, "I want some lean, new nic,shrooms." WALTON responded, "I can do the nic/ I can't get lean and I can't get shrooms before tomorrow sometime." He then asked if she wanted alcohol, specifically "Henny" (*Hennessy*) and she said she did. JF2 then asked, "Do u have Coke still?" WALTON said he did and he had "Plenty." He also said he had "molly." Based on my training and experience, "molly" is a street name for MDMA or ecstasy, which is a controlled substance. JF2 responded, "Oooo yess." They continue to talk about what time of alcohol and nicotine they want.

45.    At 0857 hours (UTC time), JF2 asked WALTON, "Can u get me an Uber to her." Based on the conversation thus far, I believe JF2 is asking for an Uber to JF1. He asked where she was and then ordered one for her. At 0912 hours (UTC time), he asked if she had been picked up yet and he said she had and was inside the car. At 1020 hours (UTC time), he asked if the other Uber arrived and she said, "Yes I'm inside." At 1106 hours (UTC time), he sent a message to JF2 asking her to let him know when she is outside, and he will come get her.

46.    There was an approximately three-hour gap in time until the next message was sent by WALTON at 1423 hours (UTC time). I later learned the time stamp on the 15 videos (described below) in her phone were between 1212 hours and 1353 hours. These videos were all taken in between the time stamp of the message saying to let him know when she is close and the message about a ride share home.

47.    The message at 1423 hours (UTC time) was regarding a Lyft and Uber ride. WALTON then immediately sent a message which said, "Those videos were taken on your phone?" JF2 responded, "Yesss." WALTON said, "Would you please send them to me as

13

well? / If I ever want to post any of it anywhere, I'll ask you and Rican first. / If it's going to be on something like Onlyfans or Fansly, we'll make sure you also have an account set up so I can split any profits with both of you." He went on to say, "I created a shared album and added you. / Two reasons why I want them: / 1. I'm in them. / 2. I want to practice video editing." She did not answer him.

48.    At 1442 hours (UTC time), WALTON sent JF2 an audio message asking if JF1 made it home okay because she was not answering. He then asked for her phone number and asked JF2 to call her. JF2 did not respond. WALTON then sent several unanswered text messages. On February 29, 2024, at 0112 hours (UTC time), WALTON said, "Would you send me those pictures and videos when you have a chance?" At 2332 hours (UTC time), he said, "Hey beautiful. How are you today?" On March 2, 2024, at 0637 hours (UTC time), he said, "Are you going to send me those videos? / Specifically any of the ones that I was in…"

49.    On March 2, 2024, at 1920 hours (UTC time), JF2 sent him 12 videos, all of which were sexual in nature (described below). WALTON responded, "Thank you."

50.    On March 3, 2024, at 2046 hours (UTC time), JF2 asked WALTON for money because she wanted to "buys some stuff online." He said he could but the earliest would be "Friday, the 8th" that he could sent it and asked how much she wanted. JF2 responded, "Just a few hundred."

51.    On March 5, 2024, at 2342 hours (UTC time), WALTON asked JF2, "So what's up, you got a guy now?" and "I'm just wondering if I'm still gonna be able to see you." JF2 responded, "Yes I have a guy now I'm just tryna get the last of the money because uk I do deserve the Money yk but after that I can't do nothing with you anymore." He responded, "kk."

52.    On March 8, 2024, at 2257 hours (UTC time), JF2 sent a message to WALTON which said, "Hey can u send the money today?" WALTON did not respond. On March 9, 2024, at 2019 hours (UTC time), JF2 sent "?" to WALTON. There were no more messages after this.

53.    As mentioned above, at the time I was reading the messages between WALTON and JF2, I was unable to see the actual videos and was only able to see the thumbnail of the video. I could clearly see JF1 and JF2 were engaged in sexual activity with a white male.

54.    On July 17, 2024, Honorable Judge Dwayne Moring signed an updated search warrant for JF2's phone.  After the warrant was signed, I retrieved JF2's cell phone from the temporary evidence lockers located at the San Diego Office of the California Department of Justice. I went to the hidden files in her phone and found the actual full videos previously described. The 15 videos are as follows:

| # | Time (local) | Length | Description | Sent to WALTON |
|---|---|---|---|---|
| 1 | 0412 / (1212 UTC time) | 0:28 | JF1 and JF2 are laying on a bed, both naked besides wearing a bra. They turn around on their knees, with their hips in the air and their genitalia exposed to the camera. They begin to shake their hips. The camera angle is from behind them. The only individuals in the room are WALTON, JF1, and JF2, thus the video was filmed by WALTON. | No |
| 2 | 0412 / (1212 UTC time) | 1:38 | The video appears to pick up where the last one left off. Both JF1 and JF2 are on the bed on their knees with their hips up and genitalia exposed. They continue to shake their hips and WALTON inserts his index finger into JF1's vagina approximately seven times. He then moves to JF2 and inserts his index finger into her vagina approximatey four times. JF1 puts her face near JF2's vagina. WALTON inserts his finger again into JF2 one time and rubs her vulva area with his thumb. He said, "Spread that pussy" and "Oh it's good." The video was filmed by WALTON. | Yes |

| 3 | 0417 / (1217 UTC time) | 1:42 | JF2 is laying on the bed on her back and WALTON is kissing her. Simultaneously, he is rubbing her vulva area and inserts his middle finger into her vagina approximately two times. WALTON then kisses/licks JF2's vulva area and the side of his face can be seen. JF2 is showing signs of being under the influence, such as she is lethargic, and her eyes are barely opened/closed. At one point, she looks up but stares at the wall, then closes her eyes again. WALTON inserts his middle finger into her vagina three more times and then oral copulates her. In the video, JF2 can be seen wearing braces. Further, she is holding a vape smoking device, which is green in color. Previously, in her conversation with WALTON, she asked for the "Geez bar but the green apple one" (Message dated 2/28/2024 at 0855 hours (UTC time). WALTON said near the end of the video, "God that pussy is so nice." This video was filmed by JF1. | Yes |
| 4 | 0419 / (1219 UTC time) | 3:07 | WALTON is laying on his back towards the end of the bed. WALTON's tattoo, "Death be my love" can be seen on his lower abdomen. JF1 and JF2 are on their knees, and they begin oral copulating WALTON. JF1's youthful appearance can be seen in this video, as her face and eyes can be seen. Further, they both appear under the influence. Their eyes are half open and they appear lethargic. The video is taken by WALTON. | Yes |

| 5 | 0419 / (1219 UTC time) | 1:03 | This video appears to begin where the other one ended, as JF1 and JF2 are performing oral copulation on WALTON together. The video is filmed by WALTON. | Yes |
| 6 | 0419 / (1219 UTC time) | 0:59 | This video appears to begin where the other one ended, as JF1 and JF2 are performing oral copulation on WALTON together. In the video, WALTON said, "Take it deep" and "Suck it in deep."  The video is filmed by WALTON. | Yes |
| 7 | 0423 / (1223 UTC time) | 0:36 | This video appears to begin where the other one ended, as JF1 and JF2 are performing oral copulation on WALTON together. In the video, WALTON can be heard saying, "There you go, switch off." He also said, "(inaudible) the tip and the shaft" and "the tip and the shaft, switch off." The video is filmed by WALTON. | Yes |
| 8 | 0427 / (1227 UTC time) | 0:35 | This video appears to begin where the other one ended, as JF1 and JF2 are performing oral copulation on WALTON together. In the video, WALTON can be heard saying, "Take turns deep throating it" and "as deep as you can." The video is filmed by WALTON. | Yes |
| 9 | 0429 / (1229 UTC time) | 0:21 | JF1 and JF2 are laying on their backs on the bed with their legs up in the air. Their genitals can be seen, and WALTON is filming from off the bed, towards them. JF2 is smoking out of the green vape container. He said, "Side to side with the legs. Go that way, back the other way, yeah, mmm." | Yes |
| 10 | 0531 / | 2:42 | JF2 is laying on her back on the bed. WALTON is using his hand to | Yes |

17

| | | | | |
|---|---|---|---|---|
| | (1331 UTC time) | | stimulate JF2's vulva area. He inserts and unknown number of fingers into her vagina, then continues to rub her vulva area. After a few moments, he inserts two fingers into her vagina two different times. JF1 is filming. She is rubbing JF2's breasts and inserts a finger into JF2's vagina. WALTON again begins to rub her vulva area. This video was filmed by JF1. | |
| 11 | 0534 (1334 UTC time) | 3:10 | JF2 is again lying her back and now has one leg in the area. WALTON is rubbing her vulva area while simultaneously using his hand to stimulate his penis. His inserts his middle finger into her vagina approximately eight times. He then uses both hands and rubs her vulva area. He inserts his index finger into her vagina and rubs her vulva area at the same time. He inserts his middle finger into her vagina and the side of WALTON's face can be seen. He is now wearing black glasses. This video was filmed by JF1. | Yes |
| 12 | 0541 / (1341 UTC Time) | 1:17 | JF2 is laying her back. WALTON inserts his penis into her vagina at least two different times. The side of WALTONS face can be seen in the video. The video focuses on JF2's face. She appears under the influence, where her eyes are barely open. The camera angle pulls back and WALTON's penis can be seen, as well as his "Death be my love tattoo" on his lower abdomen. WALTON said, "I am pissed at him right now." I believe he is talking about his penis. This video was filmed by JF1. | Yes |

18

| 13 | 0543 / (1343 UTC time) | 2:32 | WALTON is laying on his back on the bed. JF2 is giving WALTON oral copulation, and his penis does not appear to be erect. His tattoo can be seen on his lower abdomen. He gave JF2 direction by stating, "Go tight when you go down low" and "tighter." The video is filmed by JF1. The video pulls back and WALTON's face can be seen. He said something inaudible, JF1 said something inaudible, and then WALTON said, "tighter." JF1 told JF2 to arch her back. WALTON said, "Yeah, just like that," "Keep going, keep going" and "oh fuck." He then tells JF1, "Step in for her, she's getting tired." | Yes |
| 14 | 0546 / (1346 UTC time) | 3:00 | WALTON is laying on his back on the bed. JF1 is giving WALTON oral copulation, and his penis does not appear to be erect. WALTON's face can be seen from below. WALTON said, "Just like that" and "Don't stop now." WALTON ejaculated and told JF1 to "stroke it." WALTON said, "I have a love hate relationship with cocaine and sex." He sat up and kissed JF1. A distinct tattoo can be seen in his upper chest/clavicle area. This video was filmed by JF2. | Yes |
| 15 | 0553 (1353 UTC time) | 0:19 | JF1 is wearing a black lingerie top with no underwear. She is turned away from the camera and shaking her buttocks. She shows her vulva area at one point in the video. It is unknown who took this video. | No |

55.    In the videos previously described, I was able to see WALTON's face from different angles. I also saw the tattoo on his lower abdomen and on his upper chest/clavicle

area. I later found WALTON's Instagram account, "brendon_walton." I found a photographs of WALTON on his account with the same tattoo on this upper chest/clavicle area.

56.    I saw there were six transfers where WALTON sent JF2 money. The first transfer was on December 22, 2023 for $30. The second was on January 6, 2024 for $50. The third was on February 22, 2024 for $30. The next was on February 24, 2024 for $50. The last two were on February 25, 2024 for $150 and $50. In total, WALTON sent JF2 $360 via Apple Pay.

57.    On July 22, 2024, SDHTTF TFO Schick drove to WALTON's listed address. SA Schick observed a "For Rent" sign in front of the property and contacted the rental company. The property manager stated there was only one property for rent and it was the top unit. WALTON's listed address was on the ground-level of the apartment building. TFOs then conducted open-source research and discovered WALTON's apartment was listed for rent on July 18, 2024 and removed on July 22, 2024. According to the United States Postal Service, no forwarding address was listed for WALTON.

58.    On August 7, 2024 the Federal Bureau of Investigation (FBI) searched an open-source database containing publicly available records for telephones associated with WALTON. That database listed WALTON in connection with the x4502 number as recently as August 2024 and confirmed AT&T as the telecommunications provider for the x4502 number.

59.    On August 7, 2024, the FBI submitted administrative subpoena 983000 to AT&T requesting information regarding the x4502 number. The FBI received returns for administrative subpoena 983000 the same day. The returns showed the device as active and listed Brendon WALTON as the telephone's subscriber. The returns also listed the phone's IMSI as 310280034081427.

60.    On August 23, 2024, the Honorable Allison H. Goddard signed a cell tracker warrant and pen register/trap and trace order for the x4502 number. On August 27, 2024, investigators began receiving tracking data for the x4502 number. The tracking data for the

x4502 number placed the associated device, at several points, within approximately 500 meters of 12650 Lakeshore Drive, Lakeside CA 92040. Investigators reviewed law enforcement databases which listed an address for WALTON's brother at 12650 Lakeshore Drive Unit 136, Lakeside CA 92040. Specifically, the tracking data for the x4502 number placed the associated device within approximately 500 meters of 12650 Lakeshore Drive, Lakeside CA 92040 at approximately 8:24 p.m. until 8:27 p.m. PDT on August 26, 2024 through; 12:09 p.m. until 12:43 p.m. PDT on August 27, 2024; 5:58 p.m. PDT on August 27, 2024; 7:15 p.m. PDT on August 27, 2024; 8:53 p.m. PDT on August 27, 2024; 12:27 a.m. PDT on August 28, 2024; and 1:20 a.m. PDT on August 28, 2024. Tracking data for the x4502 number continued to place the associated device within approximately 500 meters of 12650 Lakeshore Drive, Lakeside CA 92040 during the morning hours of August 28, 2024 as of 10:29 a.m. PDT. Around 11:00 a.m. on August 28, 2024, WALTON's left the complex in which 12650 Lakeshore Drive, Lakeside CA 92040 is located. WALTON was traveling in a vehicle and in a pattern consistent with the tracking data for the x4502 number. WALTON was subsequently taken into custody by law enforcement officers around 12:47 p.m. When WALTON was taken into custody, a cell phone was found in the vehicle that WALTON identified as belonging to him. During the collection of background information, WALTON was not able to identify the number of the unit in which he was residing, but WALTON stated that he was residing with his brother.

61.    On August 28, 2024, a search of 12650 Lakeshore Drive Unit 136, Lakeside, CA 92040 was conducted pursuant to search warrant 24MJ3301. During the search, investigators seized the following devices:

a. Silver Dell laptop with stickers (**Target Device #1**)

b. White Muve music cell phone with sticker on back

c. Black Unnecto cell phone with sticker on back

d. Silver Sabrent (**Target Device #2**)

e. Black LG cellphone with scratches on back

f. Black Google cellphone with scratches on back (**Target Device #3**)

g.Silver Dell laptop with power cord (**Target Device #4**)

h.Silver Apple iPad (**Target Device #5**)

62.    During the search of 12650 Lakeshore Drive Unit 136, Lakeside, CA 92040, WALTON's brother and sister-in-law stated that they were the permanent, adult residents at that location; and that WALTON had been staying there for several weeks on a temporary basis. WALTON's brother identified a room in the back of the residence as a location where WALTON stored WALTON's belongings and that WALTON otherwise slept on the couch. **Target Devices #1, #2, #4, #5**, the white Muve music cell phone with sticker on back, and the black Unnecto cell phone with sticker on back were found in the room that WALTON's brother identified as the room where WALTON stored WALTON's belongings. WALTON's girlfriend, Adult Female 1 ("AF1"), claimed ownership of **Target Device #5**, but stated that WALTON used **Target Device #5**, as well.

63.    The black LG cell phone with scratches on the back and **Target Device #3** were found on the back patio of the residence in a backpack. WALTON's brother and sister-in-law stated that the backpack did not belong to the permanent residents of 12650 Lakeshore Drive Unit 136, Lakeside, CA 92040. WALTON's brother and sister-in-law further stated that the backpack may have belonged to another visitor other than WALTON and AF1, but they were not certain.

64.    On August 29, 2024, investigators spoke to AF1. AF1 informed investigators that she met WALTON on a dating application and AF1 knew he often met other females online too. AF1 stated WALTON had no money and was solely using AF1's card to pay for items. AF1 was able to view WALTON's transactions and stated WALTON would take out cash in about $100 or $200 increments. AF1 was unaware of what WALTON would use the money for.

65.    Extractions were unable to be completed on the Black Unnecto cell phone with sticker on back (c) and the Black LG cellphone with scratches on back (e) due to the devices being damaged and unable to turn on.

66.     The Silver Dell laptop with stickers (**Target Device #1**), the Silver Dell laptop with power cord (**Target Device #4**), and the Silver Apple iPad (**Target Device #5**) were taken to the San Diego Regional Computer Forensics Lab (RCFL) for processing on or about September 9, 2024.

67.     On or about October 7, 2024, the imaging for **Target Device #1** and **Target Device #4** was completed. The devices are currently being held at the San Diego RCFL. After imaging the devices, RCFL ceased processing due to the 45-day expiration date elapsing on October 12, 2024. To date, no data has been reviewed and the encryption status is unknown.

68.     On or about November 19, 2024, agents received notification the extraction for **Target Device #5** was completed. To date, no data has been reviewed due to the 90-day expiration date elapsing on November 26, 2024. The device is currently being held at the San Diego RCFL.

## METHODOLOGY

69.     Following the issuance of this warrant, all forensic analysis of the data contained in the **Target Devices** will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

<u>PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO THE COMPUTER AND OTHER ELECTRONIC STORAGE DEVICES</u>

70.     With the approval of the Court in signing this warrant, Agents executing this search warrant will employ the following procedures regarding computers and other electronic storage devices, including electronic storage media, which may contain data subject to seizure pursuant to this warrant:

*Seizure and Retention of Instrumentalities*

a.Based upon the foregoing, there is probable cause to believe that the computers and other electronic storage devices encountered during the above-described search are instrumentalities of the enumerated offenses because there is probable cause to believe that they may contain contraband and fruits of crime as provided at Rule 41(c)(2),

23

Fed R. Crim. P., or were used in committing crime as provided at Rule 41(c)(3). Consequently, the computers and any other electronic devices are subject to seizure, retention, and possible forfeiture and destruction. Computers, other electronic storage devices, and media confirmed to contain contraband, constitute fruits of crime, or to have been used to commit crime will not be returned but will be further analyzed as provided beginning at subparagraph (c) below.

b.Seized items confirmed to be instrumentalities will not be returned and will be further analyzed as provided below. If the further analysis does not confirm that a seized item is an instrumentality, but remains incomplete or partial, the original item will be returned promptly to its owner, absent an extension of time obtained from the owner or from the Court. An image of the items will be retained and subjected to a complete forensic analysis, as provided below.

c.Computers and other electronic storage devices and media that are retained as instrumentalities will not be returned to its owner. The owner will be provided the name and address of a responsible official to whom the owner may apply in writing for return of specific data not otherwise subject to seizure for which the owner has a specific need. The identified official or other representative of the seizing agency will reply in writing. In the event that the owner's request is granted, arrangements will be made for a copy of the requested data to be obtained by the owner. If the request is denied, the owner will be directed to Rule 41(g), Federal Rules of Criminal Procedure.

*Identification And Extraction Of Relevant Data*

d.A forensic image is an exact physical copy of the hard drive or other media. After obtaining a forensic image, the data will be analyzed to identify and extract data subject to seizure pursuant to this warrant. Analysis of the data following the creation of the forensic image can be a highly technical process requiring specific expertise, equipment, and software. There are literally thousands of different hardware items and software programs, and different versions of the same program, that can be commercially purchased, installed, and custom configured on a user's computer system. Computers are

easily customized by their users. Even apparently identical computers in an office environment can be significantly different with respect to configuration, including permissions and access rights, passwords, data storage, and security. It is not unusual for a computer forensic examiner to have to obtain specialized hardware or software, and train with it, in order to view and analyze imaged data.

e. Analyzing the contents of a computer or other electronic storage device, even without significant technical issues, can be very challenging. Searching by keywords, for example, often yields many thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue: who created it, when and how it was created, downloaded, or copied, when it was last accessed, when it was last modified, when it was last printed, and when it was deleted. Sometimes it is possible to recover an entire document that was never saved to the hard drive if the document was printed. Moreover, certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications do not store data as searchable text. The data is saved in a proprietary non-text format. Documents printed by the computer, even if the document was never saved to the hard drive, are recoverable by forensic programs but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. Similarly, faxes sent to the computer are stored as graphic images and not as text. In addition, a particular relevant piece of data does not exist in a vacuum. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed the data requires a search of other events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which user had logged in, whether users share passwords, whether the computer was connected to other computer or networks, and whether the user accessed or used other programs or services in the time

period surrounding events with the relevant data can help determine who was sitting as the keyboard.

f. It is often difficult or impossible to determine the identity of the person using the computer when incriminating data has been created, modified, accessed, deleted, printed, copied, uploaded, or downloaded solely by reviewing the incriminating data. Computers generate substantial information about data and about users which generally is not visible to users. Computer-generated data, including registry information, computer logs, user profiles and passwords, web browsing history, cookies, and application and operating system metadata, often provides evidence of who was using the computer at a relevant time. In addition, evidence such as electronic mail, chat sessions, photographs and videos, calendars, and address books stored on the computer may identify the user at a particular, relevant time. The manner in which the user has structured and named files, run or accessed particular applications, and created or accessed other, non-incriminating files or documents, may serve to identify a particular user. For example, if an incriminating document is found on the computer but attribution is an issue, other documents or files created around that same time may provide circumstantial evidence of the identity of the user that created the incriminating document.

g. Analyzing data has become increasingly time-consuming as the volume of data stored on a typical computer system and available storage devices has been mind-boggling. For example, as single megabyte of storage space is roughly equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is roughly equivalent of 500,000 double-spaced pages of text. Computer hard drives are now being sold for personal computers capable of storing terabytes (1,000 gigabytes) of data. And this data may be stored in a variety of formats or encrypted (several new commercially available operating systems provide for automatic encryption of data upon shutdown of the computer). The sheer volume of data also has extended the time that it takes to analyze data. Running keyword searches takes longer and results in more hits that must be

individually examined for relevance. And once reviewed, relevant data leads to new keywords and new avenues for identifying data subject to seizure pursuant to the warrant.

h.Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including the use of hashing tools to identify evidence subject to seizure pursuant to this warrant, and to exclude certain data from analysis, such as known operating system and application files. The identification and extraction process may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within one-hundred and twenty (120) days from the data of seizure pursuant to this warrant, absent further application to this Court.

## PROCEDURES FOR ELECTRONICALLY STORED INFORMATION AS TO ANY MOBILE DEVICE

71.    It is not possible to determine, merely by knowing the mobile device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, mobile devices do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some mobile device models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data

acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

72. Following the issuance of this warrant, I will collect the subject mobile devices and subject them to analysis.

73. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

## GENUINE RISK OF DESTRUCTION OF DATA

74. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

75. The United States has not attempted to obtain the evidence sought herein other than to the extent described above.

//
//
//
//
//
//
//
//
//

**CONCLUSION**

76.    Based on the foregoing, I believe there is probable cause to believe items that constitute evidence of violations of federal criminal law, namely, violations of 18 U.S.C. sections 1591, 2422(b) and 2251(a), as described in **Attachments B-1 to B-5**, will be found in the devices to be searched, as provided in **Attachments A-1 to A-5**. Therefore, I respectfully request that the Court issue this warrant.


*Katherine Adams*
_____
Katherine Adams
Special Deputy U.S. Marshal


Attested to by the applicant telephonically on February 14, 2025 in accordance with Fed. R. Crim. Proc. 4.1

_____
HONORABLE MICHAEL S. BERG
United States Magistrate Judge

## **ATTACHMENT A-5**
PROPERTY TO BE SEARCHED

a.      Silver Apple iPad (**Target Device #5**), currently in the possession of the San Diego RCFL. **Target Device #5** is presently located and stored in the Southern District of California.

# ATTACHMENT B-5
## ITEMS TO BE SEIZED

Authorization to search for and seize evidence that relates to violations of 18 U.S.C. §§ 1591, 2422(b), and 2251(a). This authorization includes the mobile device and storage devices, such as SIM cards or memory devices attached to, inserted in or seized with the device. Such devices will be searched and seized in accordance with the "Procedures For Electronically Stored Information as to Mobile Devices" provided in the affidavit and submitted in support of this warrant. The following data will be seized only to the extent that it contains evidence of violations of 18 U.S.C. §§ 1591, 2422(b), and 2251(a), such as communications, records, or data, including emails, text messages, photographs, audio files, videos, or location data:

A. tending to indicate efforts to send, receive, or possess child pornography, as defined by 18 U.S.C. § 2256;

B. tending to identify other facilities, storage devices, or services–such as email addresses, IP addresses, phone numbers–that may contain evidence of efforts to send, receive or possess child pornography, as defined by 18 U.S.C. § 2256;

C. tending to identify co-conspirators, criminal associates, or others involved in sending, receiving or possessing child pornography, as defined by 18 U.S.C. § 2256;

D. tending to indicate efforts to recruit, entice, harbor, transport, provide, obtain, or maintain a person for the purposes of engaging in a commercial sex act;

E. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers—used to facilitate human trafficking;

F. tending to identify funding sources, bank accounts, and financing methods involved in payments for commercial sex acts;

G. tending to show efforts to solicit individuals on websites for commercial sex act;

H. tending to identify the transportation of individuals to, or presence at, locations used for commercial sex acts;

I. tending to identify the user of, or persons with control over or access to, the subject phone; or

J.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data described above.